appeals denial or reversal of the immigration court's grant of his application for relief under the Convention Against Torture. Now the immigration court did correctly decide that Nani merited the relief of protection under the Convention Against Torture because, as the court analyzed, at every single step in a chain of hypotheticals Nani was more likely than not to proceed down the path that would eventually lead to his torture. So in its case, the immigration judge heavily considered documentary evidence in part because it made a negative credibility finding regarding Nani and in part because the evidence of country conditions in Eritrea was so very specific about what would happen to Nani as a returned refugee who was being taken back to Eritrea. And in that chain of hypotheticals Nani would be removed from the United States if ordered removed by the court. He would be taken to Eritrea and there would clearly be some communication between the government for the United States government to hand over an individual to the Eritrean government. So he would be identified immediately by the Eritrean government. So we know he would come to their attention. From there, most people whose whereabouts are known as Nani would be taken to a prison near Tessini where torture occurs. And because we know he's going to come to the attention of the government, because we know the government will most likely take him to this prison or somewhere else within the prison system, and because we know that torture occurs in that system and also specifically government employees commit torture against individuals who have evaded national service, as has Nani, who have fled the country. As has Nani. And also, there's an ongoing history of discrimination and prejudice and even things like stealing land from Kunama people, which is Nani's ethnicity. And it's critical to consider all of these aggregate factors in his case. This isn't just a case of anyone in Eritrea might be tortured. This is a case where Nani has shown specifically that he is at risk because of his status as a national service evader and miscapia forcible conscription because of his status as a returned refugee and because of his ethnicity. So in overturning the immigration judge's decision, the Board of Immigration Appeals clearly erred in not considering evidence in the aggregate. It gave a one-page, not even one page, one paragraph assessment of the immigration judge's decision in which it ignored the evidence in the record regarding country conditions. It did not consider the specific factors in Nani's case, such as being a national service evader or returning refugee. And it didn't even cite to what specific link in this chain of causation the BIA believed wasn't proven in this case. It couldn't do that because all of those links had been proven and accordingly Nani deserves the relief of protection under the Convention Against Torture because he would be tortured if returned to Eritrea. Now given that the immigration judge correctly found that Nani would be tortured, there was no prejudice to him from all of the serious due process violations in his case. But once the Board of Immigration Appeals overturned that decision and due process concerns become a major issue here. From the get-go, Nani was denied an interpreter in the Kunama language. Now the judge did put effort into finding a Kunama interpreter, but was unable to and so had Nani proceed with a Tigrinya interpreter. Now this was severely prejudicial to Nani because he is not fluent in Tigrinya and this pervaded the entirety of his case causing prejudice in all areas. So first Nani was required at the court's suggestion to give a more limited direct case and provide a detailed affidavit, which he did to try to minimize some of the prejudice from not having an adequate interpreter. But that can only address... I thought you agreed to that. As I read the transcript you were asked whether that would be sufficient and you said yes, the affidavit was very comprehensive and that would be sufficient for the direct case or something to that effect. So Nani had objected to not having the Kunama interpreter in the first place. When the court made it clear a Kunama interpreter wouldn't be provided, Nani attempted to accommodate the court through this suggestion of providing the detailed affidavit, but he never withdrew his motion for a Kunama interpreter or his objection to a Tigrinya interpreter. And so he proceeded to the case with this Tigrinya interpreter and that led to numerous communication difficulties. It's clear throughout the record. Nani is saying I don't understand. He's giving non-responsive answers to questions. This case is very much like Thun v. Gonzales in which the interpreter was not adequately translating and one of the haunting concerns the court noted in Thun is that we can see this many errors in translation, but that doesn't mean there weren't other times when the respondent and the interpreter fully believed they understood each other, but weren't using the same words and that it was mistranslated for the court and nobody ever recognized that error, which is another element of the due process violation here in Nani's case. Additionally when the government entered Exhibit 10, which was offered at the hearing for the first time, Nani did not have the opportunity to review that in his own language. He didn't have any interpreter who could read it to him. He's illiterate and could not read it himself had it been in any language. He was not able to discuss it with his attorney. This exhibit took him entirely by surprise and furthermore this exhibit, Exhibit 10, relied on by the judge almost exclusively in determining an adverse credibility finding regarding Nani's case. So given that Nani wasn't given the opportunity to even know what was in that statement or adequately respond to it, that's a very hard of due process. Notice an opportunity to be heard and he was denied that by his denial of his Konama interpreter in this case and I would ask to reserve the rest of my time for rebuttal. Before you do that, I did want to give you a chance to respond to this colloquy at the end where the judge asks your client whether he understood the interpreter and he said yes, because she's speaking slowly in a way I could understand her. The judge asked, do you think you had a good chance to tell us your story today? And he says yes, because the way it's translated it looks clearer than before. And there are a couple of... Does that show that this is not tuned? Well, there are a couple of reasons that there's a problem with that colloquy. One is simply Nani didn't fully understand the interpreter, which is clear throughout the record. And so when he's saying, oh, I think we communicated clearly, that doesn't necessarily mean that they did because he was not understanding what she was saying. He didn't know if she interpreted correctly or not. Additionally, by requiring him to use short words, simple words to communicate with this interpreter, he wasn't able to fully develop his claim. He wasn't able to fully articulate the things he wanted to say to the court. He wasn't able to fully respond to the government's impeachment. All of those things came as a direct result of not having an interpreter in a language in which he is fluent and being required to use short, simple language to explain sometimes complicated things such as torture and trauma. Now I would reserve the rest of my time. Thank you. All right, thank you for your argument. Mr. Ramitz, we'll hear from you. Your Honor, Sam Ramitz on behalf of the United States Attorney General. This immigration case, the board provided sufficient justification for finding the immigration judge's grant of protection of the Convention Against Torture, or CAP protection for short, was too thinly supported in that it relied on one document from the European Asylum Support Office, which I'll refer to as the ESO report for short, and to find that Mr. Kedda established a clear probability of torture. But that report, as the board explained, admits it really doesn't know what happens to deportees in Eritrea. So as the board reasonably explained, how can the immigration judge find a clear probability based on this report? And the report itself says it doesn't know what happens to people who want to go to Eritrea because, as the report explains, Eritrean removals are scarce. The Eritrean government has historically been reluctant to accept removals. It was only recently for the United States in 2017-2018 that, under the threat of visa sanctions, Eritrea accepted removals. Those numbers were 41 and 61 in those years, respectively. And as the report explained, because of the scarcity of removals, they simply don't know what happens. And that, if you base a finding of a clear probability of torture on this report, the board correctly reverses that and says that's just too thinly supported. Whereas, as the court explained in Muhammad, the IJS conclusion outpaced the evidence. It's relying on a report on clear probability of torture, which really doesn't say they know what happens to deportees. It says the information is scarce, and moreover, when you look at the report, the board noted this as well. It relies on anecdotal evidence, and anecdotal evidence from dissimilarly situated people. These were people deported over the Sudanese land border with Eritrea and placed in a prison near the Sudanese-Eritrean border, a prison called Tesimi. There's no evidence that Petitioner would be deported over the Sudanese land border because he wouldn't be deported from Sudan. He would be deported from the United States, which would of course be by air. And the East report discusses in the footnotes one removal from the United States, and that removal occurred through the Egyptian airport, and that one going to land in Asmara, Eritrea. So, when the report doesn't state they know what happens to deportees, and moreover, states that the anecdotal accounts they possess are about Sudanese land border removals, this is just not the kind of information the immigration judge properly relies upon to make a finding of a clear probability of torture. And finally, has the board adopted a consistent position on removals to Eritrea? Are they routinely denying them unless there's some specific showing that relates to an individual? The board doesn't see very often Eritrean removals. As the statistics show, it's only been more recent that we've started removing people. I've been working in office immigration litigation for 14 years, and this is the first Eritrean removal I've seen. So, I don't think it just comes up that often to have a consistent position on Eritrea. And so, I just had one final point to make about the ESA report, was that one, it admits it doesn't have information on what happens to deportees. Two, the information it has is anecdotal evidence for people deported over Sudanese land border, which is not petitioner. And three, it doesn't report that these deportees were tortured. Rather, what you see on page 365 is a separate sentence that says, torture is reported in prison. As petitioner stated, torture is reported in prisons in Eritrea. But nothing in that report says that torture occurred because someone was a deportee. So, we just have failings at every step of the evidence. It's just too thinly spaced to support a cap protection findings. The board, I think, reasonably explained all these points in its decision. And also note that petitioner said that there was an aggregate finding that should have occurred based on his evasion of national service and his deportee status and his kunama status. However, the immigration judge even found there would be no clear probability of torture based on his kunama ethnicity, citing the fact that petitioner's mother and son or mother and sibling live in Eritrea and have come to no harm. So, kunama was never a factor. The immigration judge denied that too. And as far as him being a national service evader, petitioner's testament about this was found to be not credible. And so, moving to the adverse credibility determination, the standard review being the record must compel a conclusion contrary to what the agency found, petitioner's two disparate accounts of what happened to him in Eritrea prior to 2000 adequately support adverse credibility determination. So, anything he said about what happened to him in Eritrea, both the immigration judge and the board found simply could not be relied upon because it was not credible. And just quickly state what the disparities were. He stated in his asylum interview in 2007 that he left Eritrea because he feared his land would be taken or alternatively said his land was taken. He feared conscription into the military and that's why he came to Ethiopia. But if you fast forward to 2018, suddenly he was in prison for seven years in Eritrea. He was electrocuted. He was beaten. None of that was mentioned in his asylum officer in 2007. And that clearly is two disparate accounts of what happened to him in Eritrea, which is properly found to support adverse credibility determination, not to mention the fact that petitioner's son's testimony had no knowledge of this imprisonment. He was a teenager, he said, in Eritrea and he didn't know his father was in prison for seven years. He also testified that his mother never mentioned his father being in prison for seven years. These are all things that support the adverse credibility determination. And lastly, for due process issues, as the panel noted, this is for the translation or the language barrier claim. There's a colloquy at the end where petitioner himself admits that I was, I believe I had an opportunity to present his case. And to that point, petitioner has never pointed out what exactly would have gone differently, what he failed to explain. He provided responsive answers when asked about these two disparate accounts. His answers just weren't persuasive. They variously said, well, I told the asylum officer about the seven years of torture in prison, but he didn't write it down, or I told the interpreter, the interpreter failed to relay it, or also the interpreter just simply didn't have the words to express my seven years of torture. Yes. Do hold on just a moment. I think your counterpart dropped off the conference. Sure, certainly. And I assume she'll try to rejoin, but it seems only fair that she should be able to hear what you're saying. So let's wait a moment here and see if the clerk can get Ms. Maffitt back on. Judge Palatine, I'm going to try to give her a call. Very well. I'm trying to reach Jessica Maffitt. This is Kim Smith with the Eighth Circuit Court of Appeals. Hello? Ms. Maffitt? Oh, I'm sorry, my internet connection just fell. Hello? Hello? Ms. Maffitt? Yes. Alright, we have you on the audio only to complete the argument. Okay, I apologize. Alright, Ms. Maffitt, if you can hear, we'll have Mr. Ramnitz resume his argument. When you dropped off, he was just starting to address the colloquy between the judge and Mr. Deedat regarding whether he could understand the interpreter. So, go ahead, Mr. Ramnitz, if you'd pick up there, please. Certainly. So, for the colloquy, Petitioner provided responsive answers when asked about these two disparate accounts of his alleged torture in Eritrea. He variously provided that he told the asylum officer in 2007 that the seven years of imprisonment and torture happened to him, but the asylum officer simply did it down, which wasn't explicit, but he at the same time admitted that the asylum officer had done everything else correctly of what he said. Ms. Maffitt, would you please mute your phone if you're not speaking? I think we're getting some feedback. All right, please proceed. And otherwise, variously explained responsibly that he told the interpreter the seven years of torture, but the interpreter just simply chose not to relate to the asylum officer, or the interpreter didn't have the words to describe the seven years of imprisonment. So, he answered responsibly when presented with these disparate accounts, and Petitioner has never actually explained what would have gone differently if there would have been a kunama interpreter. Granted, that would have been ideal to have a kunama interpreter, but you can see in the record the immigration judge made repeated efforts to find one. One simply wasn't available, but it wasn't a due process violation to proceed with the Tingria interpreter in this case. And just lastly note that Judge Malloy asked about a consistent position on Eritrea from the board, but I can say I did check with Immigrations and Customs Enforcement prior to this argument, and removals to Eritrea remain ongoing. So, we are still removing individuals to Eritrea. This is more of a comment than a question, I guess. The question that you said that was relied upon, that he didn't talk about the seven years imprisonment, reads, have you ever been arrested, or have you ever committed or helped someone else commit a crime? It seems like an inartfully worded way to put it, because if your position is, I was arrested, but I never committed a crime, and I was arrested because I'm a member of a protected group, it doesn't really ask that. I don't know that makes a difference in this case. I just thought it was a very inartfully worded question for someone who doesn't believe they ever committed a crime. That could be, and that's an argument Petitioner makes, but if you go through the rest of the questions asked by Assigned Officer, it makes very clear that what he believed happened to him in Eritrea, that nothing, he was asked specifically if he was ever threatened or harmed, he said no. He left Eritrea simply because he feared his land being taken, and he feared conscription. So, the Assigned Officer ultimately elicited the proper information in this case. But I thought part of your argument was that the arrest question was inconsistent with his later statements. I don't understand that if the arrest question has to do with a crime, and he's saying I was detained for non-criminal reasons. Well, I would say that even if you went to say, I was giving the Petitioner some credit in that regard, I would say, because of two disparate statements, you just can't trust anything he said to the Assigned Officer or to the Immigration Judge. That was basically the agency's finding, that we just can't tell what to believe about you anymore. The Immigration Judge even says you claim you're a National Service Surveyor. Well, we just don't know what to believe anymore because you've had this huge discrepancy in your statements about the seven years of torture. I mean, arrested or not, he would have mentioned that. Well, I understand that. That's a different argument. But you're also arguing that his answer to the arrest about a crime question was inconsistent. Well, I don't think that our brief ever focuses on that particular question. Oh, it doesn't? Okay. Somebody focused on it. I thought it was your brief. I think I made a note about it at the end of the brief, just saying that, yes, perhaps that would be considered a consistent, according to his theory of the narrative, but it ultimately doesn't matter because there are still two disparate accounts. All right. Thank you for your argument. Thank you. Ms. Maffa, we'll hear from you in rebuttal. Thank you, Your Honor. To address the credibility issue, this has gone through fairly thoroughly in briefing, but just a few highlights on that. This isn't just a question of if the respondent's credible, we go with everything he says, and if he's not credible, we disregard everything he says. This is a situation where there's significant evidence in the record outside of the respondent's testimony that corroborates his statements. We know from the record that the Air Train government does forcibly conscript generally everyone within that country or attempts to. We do know from that record from the Department of State itself that National Service evaders and forced returnees are tortured by the government. We do know from other witnesses' testimony and from the government's impeachment exhibit even that when he initially came here, Nani explained to the asylum, a refugee processor at his refugee camp, that he was afraid he would be killed if he went back and that the government attempted to forcibly conscript him. We have all of this evidence which the board completely disregarded and didn't even discuss in its decision overturning the immigration judge's grant of relief under the Convention Against Torture. Instead, what the board did was say, we don't know what happens to returnees. Well, we've got one of the most repressive governments in the world that we're talking about here with Air Train. They stifle political discussions. They attack journalists, human rights defenders. They haven't even allowed access for human rights defenders into the country to assess these conditions. So allowing them to abuse the system by refusing to let people know what's going on with human rights and then saying, oh, you can't say there's evidence that we're doing this to everybody is wrong. The government of the United States has a duty to look at what we actually know and apply that in this case. Thank you. I believe you're muted, Your Honor. Yes, I'm sorry. I was just saying thank you to both counsel for your arguments. The case is submitted. The court will file a decision in due course.